# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ALICE ARTIS, Individually and On Behalf of All Others Similarly Situated, | ) ) ) |
| Plaintiff, | ) **Civil Action No. 07-cv-07475-PAC** ) |
| vs. | ) ) |
| | ) CLASS ACTION COMPLAINT |
| LIMELIGHT NETWORKS, INC., JEFFREY W. LUNSFORD, MATTHEW HALE, NATHAN RACIBORSKI, MICHAEL W. GORDON, WILLIAM H. RINEHART, ALLAN M. KAPLAN, WALTER D. AMARAL, JOSEPH H. GLEBERMAN, FREDERC W. HARMON, MARK A. JUNG, PETER J. PERRONE, DAVID C. PETERSCHMIDT, GARY VALENZUELA, GOLDMAN, SACHS & CO., MORGAN STANLEY & CO., INC., JEFFERIES & COMPANY, INC., PIPER JAFFRAY & CO., and FRIEDMAN, BILLINGS, RAMSEY & CO., INC., | ) ) ) ) **JURY TRIAL DEMANDED** ) ) ) ) ) ) ) ) ) |
| Defendants. | ) ) ) |

Plaintiff, Alice Artis ("Plaintiff"), alleges the following based upon the investigation by Plaintiff's counsel, which included, among other things, a review of the defendants' public documents, conference calls and announcements made by defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Limelight Networks, Inc. ("Limelight" or the "Company"), securities analysts' reports and advisories about the Company, and information readily available on the Internet, and Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

1

## NATURE OF THE ACTION AND OVERVIEW

1.     This is a federal class action on behalf of purchasers of the common stock of Limelight, who purchased or otherwise acquired Limelight's common stock pursuant or traceable to the Company's June 8, 2007 Initial Public Offering (the "IPO" or the "Offering") through August 8, 2007, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Act of 1933 (the "Securities Act") and the Securities Exchange Act of 1934 (the "Exchange Act").

2.     Limelight is a provider of high-performance content delivery network ("CDN") services.  The Company digitally delivers content for traditional and emerging media companies, including businesses operating in the television, music, radio, newspaper, magazine, movie, videogame and software industries.  Limelight's services are purpose-built for the delivery of digital media to large, global audiences.

3.     On June 8, 2007, the Company conducted its IPO.  In connection with the IPO, the Company filed a Registration Statement and Prospectus (collectively referred to as the "Registration Statement") with the SEC.  The IPO was a financial success for the Company and certain selling stockholders, as they were able to sell 16 million shares of the Company's stock to investors at a price of $15.00 per share, for gross proceeds of $240 million.

4.     The Company shocked investors on August 9, 2007 when it reported disappointing financial results for its second quarter of 2007.  The Company disclosed for the first time that its revenues were subject to seasonality, and that it had experienced a drop-off in media customers in the quarter due to the seasonality that media companies experience after the television season ends.  Finally, the Company admitted that it was experiencing price pressures in certain customer segments.

5.     On this news, shares of the Company's stock declined $5.81 per share, or over 39 percent, to close on August 9, 2007 at $8.99 per share, on unusually heavy trading volume. Subsequently, Goldman Sachs downgraded the Company's stock, and stated in an analyst report that its upgrade of the stock two weeks prior was "a mistake."  The analyst report noted that "management['s] credibility is shaken," and that "Limelight's stumble highlights that management is still getting their arms around being a public company, and has yet to put in place a lot of the infrastructure to support execution on targets."

6.     The Complaint alleges that, in connection with the Company's IPO, defendants failed to disclose or indicate the following: (1) that the Company's revenues were subject to seasonal fluctuation; (2) that the Company was experiencing severe pricing pressure for its services; (3) that the Company was experiencing a declining customer demand, which would affect the Company's revenues in subsequent financial quarters; (4) that the Company was experiencing rising expenses; and (5) that the Company lacked adequate internal and financial controls.

7.     As a result of defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class Members have suffered significant losses and damages.

**JURISDICTION AND VENUE**

8.     The claims asserted herein arise under and pursuant to Sections 11, 12(a)(2), and 15 of the Securities Act (15 U.S.C. §§ 77k and 77o), and under and pursuant to Sections 10(b) and 20(a) of the Exchange Act, (15 U.S.C. §§ 78j(b) and 78t(a)), and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).

9.     This Court has jurisdiction over the subject matter of this action pursuant to

Section 22 of the Securities Act (15 U.S.C. § 77v) and pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331.

10.    Venue is proper in this Judicial District pursuant to Section 22 of the Securities Act and pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. § 1391(b). Many of the acts and transactions alleged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this Judicial District. Additionally, the Company's IPO was actively marketed in this Judicial District, and the underwriters of the Company's IPO are located within this Judicial District.

11.    In connection with the acts, conduct and other wrongs alleged in this Complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

12.    Plaintiff, Alice Artis, as set forth in the accompanying certification, incorporated by reference herein, purchased Limelight's common stock at artificially inflated prices during the Class Period and has been damaged thereby.

13.    Defendant Limelight is a Delaware corporation with its principal place of business located at 2220 West 14th Street, Tempe, Arizona.

14.    Defendant Jeffrey W. Lunsford ("Lunsford") was, at all relevant times, the Company's Chief Executive Officer ("CEO") and Chairman of the Board of Directors.

15.    Defendant Matthew Hale ("Hale") was, at all relevant times, the Company's Chief Financial Officer ("CFO") and Secretary.

16.    Defendant Nathan Raciborski ("Raciborski") was, at all relevant times, the

Company's co-founder, Chief Technical Officer ("CTO"), and a member of the Board of Directors.

17.    Defendant Michael W. Gordon ("Gordon") was, at all relevant times, the Company's co-founder and Chief Strategy Officer ("CSO").

18.    Defendant William H. Rinehart ("Rinehart") was, at all relevant times, the Company's co-founder, and was previously the Company's CEO and a member of the Board of Directors.

19.    Defendant Allan M. Kaplan ("Kaplan") was, at all relevant times, the Company's co-founder, and a member of the Board of Directors.

20.    Defendant Walter D. Amaral ("Amaral") was, at all relevant times, a member of the Company's Board of Directors.

21.    Defendant Joseph H. Gleberman ("Gleberman") was, at all relevant times, a member of the Company's Board of Directors.

22.    Defendant Fredric W. Harman ("Harman") was, at all relevant times, a member of the Company's Board of Directors.

23.    Defendant Mark A. Jung ("Jung") was, at all relevant times, a member of the Company's Board of Directors.

24.    Defendant Peter J. Perrone ("Perrone") was, at all relevant times, a member of the Company's Board of Directors.

25.    Defendant David C. Peterschmidt ("Peterschmidt") was, at all relevant times, a member of the Company's Board of Directors.

26.    Defendant Gary Valenzuela ("Valenzuela") was, at all relevant times, a member of the Company's Board of Directors.

27.    Defendants Lunsford, Hale, Raciborski, Gordon, Rinehart, Kaplan, Amaral, Gleberman, Harman, Jung, Perrone, Peterschmidt, and Valenzuela are collectively referred to hereinafter as the "Individual Defendants."  The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Limelight's documents, and presentations to securities analysts, money and portfolio managers and institutional investors, i.e., the market.  Each defendant was provided with copies of the Company's reports and documents alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information available to them, each of these defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and misleading.  The Individual Defendants are liable for the false statements pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

28.    Defendant Goldman, Sachs & Co. ("Goldman Sachs") was an underwriter of the Company's IPO, as well as the lead manager of Limelight's IPO.  Defendant Goldman Sachs also served as a financial advisor to Limelight, and assisted in the preparation of the Company's IPO materials.

29.    Defendant Morgan Stanley & Co., Inc. ("Morgan Stanley") was an underwriter of the Company's IPO, as well as the joint lead manager of Limelight's IPO.  Defendant Morgan Stanley also served as a financial advisor to Limelight, and assisted in the preparation of the Company's IPO materials.

30.    Defendant Jefferies & Company, Inc. ("Jefferies") was an underwriter of

6

Limelight's IPO.  Defendant Jefferies also served as a financial advisor to Limelight, and assisted in the preparation of the Company's IPO materials.

31.    Defendant Piper Jaffray & Co. ("Piper Jaffray") was an underwriter of Limelight's IPO.  Defendant Piper Jaffray also served as a financial advisor to Limelight, and assisted in the preparation of the Company's IPO materials.

32.    Defendant Friedman, Billings, Ramsey & Co., Inc. ("Friedman Billings") was an underwriter of Limelight's IPO.  Defendant Friedman Billings also served as a financial advisor to Limelight, and assisted in the preparation of the Company's IPO materials.

33.    Defendants Goldman Sachs, Morgan Stanley, Jefferies, Piper Jaffray, and Friedman Billings are collectively referred to hereinafter as the "Underwriter Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background

34.    Limelight is a provider of high-performance content delivery network ("CDN") services.  The Company digitally delivers content for traditional and emerging media companies, including businesses operating in the television, music, radio, newspaper, magazine, movie, videogame and software industries.  Limelight's services are purpose-built for the delivery of digital media to large, global audiences.

35.    On June 8, 2007, the Company conducted its IPO.  In connection with the IPO, the Company filed a Registration Statement and Prospectus (collectively referred to as the "Registration Statement") with the SEC.  The IPO was a financial success for the Company and certain selling stockholders, as they were able to sell 16 million shares of the Company's stock to investors at a price of $15.00 per share, for gross proceeds of $240 million.

**Materially False and Misleading**
**Statements Made in the Registration Statement**

36.     Limelight's Registration Statement provided an overview of the Company, and stated, in relevant part:

> Limelight Networks is a leading provider of high-performance content delivery network services. We digitally deliver content for traditional and emerging media companies, or content providers, including businesses operating in the television, music, radio, newspaper, magazine, movie, videogame and software industries. Using Limelight's content delivery network, or CDN, content providers are able to provide their end-users with a high-quality media experience for rich media content including video, music, games, software and social media. *As consumer demand for media content over the Internet has increased, and as enabling technologies such as broadband access to the Internet have proliferated, consumption of rich media content has become increasingly important to Internet end-users and therefore to the content providers that serve them. We developed our services and architected our network specifically to meet the unique demands content providers face in delivering rich media content to large audiences of demanding Internet end-users. Our comprehensive solution delivers content providers a high-quality, highly scalable, highly reliable offering at a low cost.* As of May 2007, approximately 800 customers are using Limelight Networks to deliver the high-quality media experiences that their consumers seek online.  [Emphasis added.]

37.     Regarding the Company's business and operations, the Registration Statement, in relevant part, stated:

> We have designed our CDN solution specifically to handle the demanding requirements of delivering rich media content over the Internet. Our solution enables content providers to provide their end-users with high-quality experiences across any digital media type, content library size or audience scale without expending the capital and developing the expertise needed to build and manage their own networks. Our CDN solution delivers the following benefits to our customers:

> ***High-Quality User Experience***

> We enable users to receive their requested content such as movies, television shows, games, songs and software downloads in a timely

manner and to enjoy a high-quality media experience. We accomplish this, in part, by delivering content from servers that can be closer to users than a content provider's own servers, and by delivering more than half of our content volume directly to a user's access network, bypassing much of the congestion typically experienced in the public Internet. We also operate a dedicated high-speed (10 gigabits per second) backbone that enables us to move content quickly between locations on our network.

* * *

*We have observed a number of trends in our business that are likely to have an impact on our financial condition and results of operations in the foreseeable future. Traffic on our network has grown in the last three years. This traffic growth is the result of growth in the number of new contracts, as well as growth in the traffic delivered to existing customers. Our near-exclusive focus is on providing CDN services, which we consider to be our sole industry segment.*

Historically, we have derived a small portion of our revenue from outside of the United States. Our international revenue has grown recently, and we expect this trend to continue as we focus on our strategy of expanding our network and customer base internationally. For 2005 and 2006, 5% and 8%, respectively, of our revenue was derived outside of the United States, of which nearly all was derived from operations in Europe. We generated no revenue from outside the United Sates in 2004. We expect foreign revenue in 2007 will grow in absolute dollars and as a percentage of total revenue from what we have experienced historically. Our business is managed as a single geographic segment, and we report our financial results on this basis. [Emphasis added.]

38.    The Company's Registration Statement also represented how the Company generated revenue, and stated, in relevant part:

*We primarily derive revenue from the sale of CDN services to our customers.* These services include delivery of digital media, including video, music, games, software and social media. *We generate revenue by charging customers on a per-gigabyte basis, or on a variable basis based on peak delivery rate for a fixed period of time, as our services are used.* Our customer agreements relating to these recurring services generally have a term of one to three years. However, some of our contracts with large customers operate on a month-to-month basis. *The majority of our agreements generally commit the customer to a minimum*

9

*monthly level of usage and provide the rate at which the customer must pay for actual usage above the monthly minimum.* Our customer agreements typically renew automatically at the end of the initial term for an additional period unless the customer elects not to renew. Based on service usage experience, we and our customers often negotiate revised monthly minimum usage levels or other modified services or terms during a commitment period. For example, in exchange for increased minimum usage levels, we often agree to a reduced per-gigabyte pricing structure. *Historically, we have derived substantially all of our revenue from these recurring service arrangements, which accounted for 94%, 98% and 99% of our revenue in 2004, 2005 and 2006, respectively.*

* * *

*Our net revenue and cost of net revenue have increased sequentially during the last nine quarters associated with growth in service revenue from existing customers and the continuous addition of new customers each quarter.*

*To date, we have not identified any seasonal fluctuations in our quarterly results.* [Emphasis added.]

39.     Regarding the Company's growth strategy, the Registration Statement, in relevant part, stated:

*Our core set of customers are traditional and emerging media companies, including businesses operating in the television, music, radio, newspaper, magazine, movie, videogame and software industries. We intend to continue to focus on this group as we believe it represents a stable and growing business opportunity. There has been rapid growth of rich media content delivered over the Internet in recent years, and we believe that the market will continue to experience robust growth.* [Emphasis added.]

40.     Limelight's Registration Statement also emphasized the growth of the Company's business, as well as the growth of its market.  The Registration Statement, in relevant part, stated:

*Our comprehensive solution delivers content providers a high-quality, highly scalable, highly reliable offering at a low cost.* As of May 2007, approximately 800 customers are using Limelight Networks to deliver the high-quality media experiences that their consumers seek online.

*We are rapidly growing our content delivery capacity and expanding our sales and service capabilities in advance of what we believe will be a dramatic and sustained surge in Internet traffic. The environment in which we are scaling our business is characterized by three macro trends, all of which reinforce the need for content delivery networks*:

- consumption and distribution of rich media content are expanding rapidly;

- older alternatives for delivering rich media content over basic Internet connections are not scaling well; and

- a new set of technical, management and economic requirements have emerged for content providers to meet the needs of demanding consumers of rich media content.

**Consumption and Distribution of Rich Media Content Expanding**

*Multiple forces have created, and continue to drive, a substantial unmet need to rapidly and efficiently deliver large files and broadcast-quality media to large audiences over the Internet. These forces include the following:*

- ***Proliferation of broadband Internet connections.***  According to a report from Strategy Analytics, nearly half of all North American households had broadband Internet access in 2006, with broadband Internet penetration expected to reach 73% by 2010. In addition, IDC estimates that the average speed of downstream access for a broadband connection, the speed at which an end-user accesses media files, doubled from the third quarter of 2004 to the same quarter of 2006 ("Market Analysis: U.S. Broadband Services 2006-2010 Forecast," IDC, September 2006). The proliferation of broadband Internet connections has provided an increasing number of users with the capability to access rich media content efficiently.

- ***Consumption of media via the Internet is rivaling consumption via other media channels.***  The proliferation of broadband Internet has fundamentally changed the way that consumers access and interact with media content. According to a recent survey by Forrester Research, Inc., consumers between the ages of 18-26 in U.S. online households spend 12.2 hours per week using the Internet, compared to 10.6 hours per week watching television ("State of the Consumers and Technology: Benchmark 2006," Forrester Research, Inc., July

2006). In addition, eMarketer estimates that at the end of 2006, nearly 60% of all Internet users regularly watched videos online. That number is expected to climb to 80% by the end of 2010.

- ***Consumers desire on-demand access to a broad range of personalized media content.*** Through technologies like Internet search, personal digital video recorders, video-on-demand and social media platforms, consumers are increasingly accustomed to immediate, on-demand access to media content, including videos, music and photos provided by media or content providers or by users themselves.

- ***Proliferation of Internet-connected devices.*** The proliferation of devices that are capable of connecting to the Internet, such as MP3 players, mobile phones and videogame consoles, has given users even more control and flexibility over how and where they access and use media content from the Internet.

* * *

The capital, expertise, and other managerial effort necessary to meet these requirements can be challenging. As demand for the delivery of rich media content increases, these challenges will become increasingly difficult to meet. ***We believe, therefore, that there is a significant opportunity for an outsourced Internet content delivery network optimized for the delivery of rich media content.*** [Emphasis added.]

41.     The Registration Statement also purported to warn investors about the potential for declining demand, as well as pricing issues for the Company's products.  The Registration Statement, in relevant part, stated:

**Rapidly evolving technologies or new business models could cause demand for our CDN services to decline or could cause these services to become obsolete.**

Customers or third parties may develop technological or business model innovations that address content delivery requirements in a manner that is, or is perceived to be, equivalent or superior to our CDN services. ***If competitors introduce new products or services that compete with or surpass the quality or the price/performance of our services, we may be unable to renew our agreements with existing customers or attract new customers at the prices and levels that allow us to generate attractive rates of return on our***

*investment.* For example, one or more third parties might develop improvements to current peer-to-peer technology, which is a technology that relies upon the computing power and bandwidth of its participants, such that this technological approach is better able to deliver content in a way that is competitive to our CDN services, or even that makes CDN services obsolete. We may not anticipate such developments and may be unable to adequately compete with these potential solutions. In addition, our customers' business models may change in ways that we do not anticipate and these changes could reduce or eliminate our customers' needs for CDN services. If this occurred, we could lose customers or potential customers, and our business and financial results would suffer. As a result of these or similar potential developments, in the future it is possible that competitive dynamics in our market may require us to reduce our prices, which could harm our revenue, gross margin and operating results.

**If we are unable to sell our services at acceptable prices relative to our costs, our revenue and gross margins will decrease, and our business and financial results will suffer.**

Prices for content delivery services have fallen in recent years and are likely to fall further in the future. Recently, we have invested significant amounts in purchasing capital equipment to increase the capacity of our content delivery services. For example, in 2006 we made $40.6 million in capital expenditures, primarily for computer equipment associated with the build-out and expansion of our CDN. Our investments in our infrastructure are based upon our assumptions regarding future demand and also prices that we will be able to charge for our services. These assumptions may prove to be wrong. *If the price that we are able to charge customers to deliver their content falls to a greater extent than we anticipate, if we over-estimate future demand for our services or if our costs to deliver our services do not fall commensurate with any future price declines, we may not be able to achieve acceptable rates of return on our infrastructure investments and our gross profit and results of operations may suffer dramatically.*

In addition, in 2007 and beyond, we expect to increase our expenses, in absolute dollars, in substantially all areas of our business, including sales and marketing, general and administrative, and research and development. In 2007 and 2008, as we further expand our CDN, we also expect our capital expenditures to be generally consistent with the high level of expenditures we made in this area in 2006. *As a consequence, we are dependent on significant future growth in demand for our*

>    *services to provide the necessary gross profit to pay these*
>    *additional expenses.* [Emphasis added.]

42.    The statements contained in ¶¶ 36 – 41 were materially false and misleading when

made because defendants failed to disclose or indicate the following: (1) that the Company's

revenues were subject to seasonal fluctuation; (2) that the Company was experiencing severe

pricing pressure for its services; (3) that the Company was experiencing a declining customer

demand, which would affect the Company's revenues in subsequent financial quarters; (4) that

the Company was experiencing rising expenses; and (5) that the Company lacked adequate

internal and financial controls.

## The Truth Begins to Emerge

43.    On August 9, 2007, the Company issued a press release entitled "Limelight

Networks Reports Second-Quarter 2007 Results; Bookings Performance and Customer

Additions Position Company for Continued Growth."  Therein, the Company, in relevant part,

stated:

>    Limelight Networks (Nasdaq:LLNW), a leading content delivery
>    network (CDN) for digital media, today reported financial results
>    for the second quarter ended June 30, 2007.
>
>    For the second quarter of 2007, Limelight Networks reported
>    GAAP revenue of $21.2 million and non-GAAP revenue of $24.7
>    million, representing growth of 43% and 67%, respectively, over
>    the $14.8 million of revenue the company reported in second
>    quarter of 2006. The company reported a second quarter GAAP
>    loss per diluted share of $(0.23) and non-GAAP earnings per
>    diluted share of $0.00. Non-GAAP Adjusted EBITDA for the
>    quarter was $4.4 million compared to $5.7 million for the second
>    quarter of 2006. A reconciliation of GAAP to non-GAAP
>    financials is provided in the table below.
>
>    "We achieved numerous milestones and executed well on our plan
>    to establish Limelight Networks as the premier content delivery
>    and enablement partner for businesses desiring to deliver rich
>    media assets such as video, music, games, software and social

14

media over the Internet," commented Jeff Lunsford, chairman and chief executive officer. Operating highlights in the quarter include:

- capitalizing the business with over $200 million in growth capital raised in an IPO, provisioning us with over $187 million in cash and marketable securities on June 30, 2007 after paying down debt;

- achieving new business bookings more than double those achieved in the second quarter of 2006;

- the addition of 149 net new customers in the quarter, bringing total customers up to 876 on June 30, 2007;

- the hiring of 14 enterprise sales reps into a growing worldwide sales force, bringing total quota-carry representatives up to 58 at the end of June; and

- an increase of total network egress to a capacity of approximately 1.4 terabits per second, positioning the company as a scale leader in servicing the high-growth and high-traffic publishers' Internet content.

Limelight Networks also disclosed an expanded 5-year individual customer arrangement pursuant to which Limelight Networks will provide custom CDN consulting services and will continue its content delivery services. Additionally, Limelight and the customer agreed to cross-license certain technologies, including certain components of Limelight's CDN software. This contract is a multi-element arrangement, which required a change, beginning in the second quarter, in how Limelight accounts for revenue from consulting, as well as the company's standard content delivery services delivered to this customer. Because of the nature of the contract with this customer and the company's consequent revenue recognition, the company has determined that it will present both GAAP and non-GAAP revenue and earnings amounts to help illustrate the impact of this contract.

"We believe Limelight Networks is well positioned," commented Lunsford, "to grow our business as broadband Internet access continues to propagate around the world, as content delivery shifts from analog to digital networks and as consumers' content consumption preferences shift to the online channel."

**Guidance**

For the third quarter of 2007, the company anticipates:

- GAAP revenue to be in the range of $27 to $28 million

- Non-GAAP revenue to be in the range of $25.5 to $26.5 million

- GAAP loss per diluted share to be in a range of ($0.10) to ($0.08)

- Non-GAAP loss per diluted share to be in a range of ($0.06).to ($0.04)

- Non-GAAP Adjusted EBITDA in the range $1 to $2 million

For the full year of 2007, the company anticipates:

- GAAP revenue to be in the range of $101 to $103 million

- Non-GAAP revenue to be in the range of $103 to $105 million

- GAAP (loss) per diluted share to be in a range of ($0.54) to ($0.51)

- Non-GAAP earnings per diluted share to be in a range of $0.00 to $0.02

- Non-GAAP Adjusted EBITDA in the range of $16 to $19 million

44.    Also on August 9, 2007, the Company held an earnings conference call with investors and financial analysts.  During this call, Defendant Lunsford, in relevant part, stated:

JEFF LUNSFORD: We began to experience some unanticipated drop-off in a few of our media customers in our June and July revenue. ***We believe this drop-off is due to the seasonality that media companies experience after the television season ends. In addition we began to feel some increased price pressure in certain customer segments which I will discuss in a moment. These two factors are leading us to be cautious in where we are setting revenue and earnings guidance for Q3 and the full year.*** Despite of the strong bookings I mentioned earlier.

* * *

***This brings us to pricing.*** Over the last 30 days investors have begun focusing on a potential price war in the CDN marketplace so we thought it would be helpful to discuss what we are seeing in our sales channel with you directly today. ***We are beginning to***

16

***experience some price pressure in the marketplace. We feel it is coming not so much from a price war as directly from content providers that are seeing extremely rapid traffic growth.*** These are normally the forward thinking providers that are pushing the envelope on consumer experience by investing in the higher resolution and thus higher bit rate streams which consumers prefer. In some cases the traffic growth is occurring ahead of the maturation of those customers' monetization strategies and they are asking for lower per-unit rates as their volumes grow and as their business models develop.

\* \* \*

[ANALYST]: … And then just any visibility you can provide us at this point to what you have into Q4 revenues. Q4 revenue guidance does look somewhat conservative given your relatively solid Q3 guidance. How should we think about the Q4 ramp? And I have just a follow-up question for Matt. Can you give us a sense for the share count for Q3?

JEFF LUNSFORD: So with the Q4 I guess you are just backing out the Q3 guidance from the full year; and again we believe the right thing to do here when we are seeing a little bit of seasonality that we haven't seen in the past, is to just step back and monitor that. All of our customers are forecasting good big projects for the fall but we believe it would be aggressive to just assume that all that is going to happen. And the way our forecasting works is that we take current month revenue and flow it through and add new bookings to that. ***And when you have a dip from seasonality in a month like July then that flows through into Q3 and Q4*** and so we just think while bookings are ahead of plan and doing great and adding to the revenue, we want to make sure that we don't overestimate the return of that seasonal traffic in the fall.

\* \* \*

[ANALYST]: ***So when you think about what has changed between when you are on IPO roadshow and now, obviously seasonality seems to be something new, more severe pricing pressure you mentioned as well.*** If you had to kind of be one of those -- does one of those have a bigger impact on your guidance versus the other? Is it fairly equal? I am just trying to understand the magnitude –

JEFF LUNSFORD: ***I would probably say it is about equal*** because we have some reasonably large customers that are in this category of high traffic working on monetization and so we just

again believe it is prudent to assume that while they are working on that we just can't -- we have always viewed ourselves as partners to our customers and not as an arms length bare fisted vendor that is going to gauge every penny out of them. We want these guys to be successful. ***So I would say it is about half that and it is about half the seasonality. It is hard to quantify it on the fly but those are really the two factors.***

\* \* \*

[ANALYST]: Just [as a] follow up on the EBITDA guidance [it] was also a little lower than we were expecting for -- can you give us some color? Is that more just a little lower revenue expectation or is that more increased sales and marketing and maybe the pricing pressure that you have noted? Thank you.

JEFF LUNSFORD: So it is a combination, Aaron. ***I think the guidance of 103 to 105 million in pro forma revenue is a little lower than we have been modeling as I mentioned for the two reasons of seasonality and just being cautious about price pressure.*** And in that combined with the fact that the company has enjoyed kind of a good bit of prominence recently and we have been able to attract; we have been approached by many of the most talented sales and folks in the industry. And we believe the right thing to do is to go ahead and get those folks on the team while they are interested in Limelight. They are going to help us execute on this plan and move further up the enterprise value chain and deepen our relationship with many of these enterprise accounts. So we are -- we believe the right long-term thing to do here is to proceed with that sales and marketing build and build for an '08 and '09 where we see a great market opportunity and not to just because we feel a little cautious about revenue, to all of a sudden dramatically change that growth profile.  [Emphasis added.]

45.     On this news, shares of the Company's stock declined $5.81 per share, or over 39 percent, to close on August 9, 2007 at $8.99 per share, on unusually heavy trading volume.

46.     On August 10, 2007, *Barron's Online* published a story entitled "Limelight's Slide Continues; Goldman Pulls Buy Rating," which in relevant part, stated:

> ***Limelight Networks (LLNW) shares, which plunged yesterday on disappointing guidance, in particular projecting far lower EBITDA for this year than the Street had expected, has extended its slide today, as Goldman Sachs analyst Sarah Friar downgraded the stock to Neutral from Buy.***

*Friar writes that her upgrade of the stock two weeks ago was "a mistake." (And not a small one; the stock has since lost about half of its value.) She says that "management credibility is shaken," and adds that pricing and seasonality dynamics in the content delivery network market suggest "a maturity level in the CDN market that was not evident a quarter ago."*

*"Limelight's stumble highlights that management is still getting their arms around being a public company, and has yet to put in place a lot of the infrastructure to support execution on targets," she writes. "Secondly, there also appears to be a shifting dynamic in the CDN industry," with "tougher pricing."*

*She says that to turn bullish she would want to see "more evidence that management has put in place the right internal infrastructure, and more time to evaluate the path that pricing is taking in the industry."*

Friar cut her 2007 EPS estimate to a loss of 6 cents from a loss of 4 cents; for next year she goes to a loss of 6 cents from a profit of 16 cents; for '09 she now sees EPS of 8 cents, down from 36 cents. Her price target drops to $12 from $22.

Limelight, which yesterday fell $5.81, or 39%, to $8.99, today is down another 96 cents to $8.03. The stock is now down 47% since coming public June 7 at $15 a share.  [Emphasis added.]

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

47.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Limelight's common stock pursuant or traceable to the Company's June 8, 2007 IPO through August 8, 2007, inclusive (the "Class Period"), and who were damaged thereby (the "Class").  Excluded from the Class are defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

48.    The members of the Class are so numerous that joinder of all members is

impracticable.  Throughout the Class Period, Limelight's common stock was actively traded on the NASDAQ.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Limelight or its transfer agent, and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

49.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

50.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

51.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)    whether the federal securities laws were violated by defendants' acts as alleged herein;

(b)    whether statements made by defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Limelight; and

(c)    to what extent the members of the Class have sustained damages and the proper measure of damages.

52.    A class action is superior to all other available methods for the fair and efficient

adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

### UNDISCLOSED ADVERSE FACTS

53.    The market for Limelight's common stock was open, well-developed and efficient at all relevant times.  As a result of these materially false and misleading statements and failures to disclose, Limelight's common stock traded at artificially inflated prices during the Class Period.  Plaintiff and other members of the Class purchased or otherwise acquired Limelight's common stock relying upon the integrity of the market price of Limelight's common stock and market information relating to Limelight, and have been damaged thereby.

54.    During the Class Period, defendants materially misled the investing public, thereby inflating the price of Limelight's common stock, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make defendants' statements, as set forth herein, not false and misleading.  Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company, its business and operations, as alleged herein.

55.    At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and other members of the Class.  As described herein, during the Class Period, defendants made or caused to be made a series of materially false or misleading statements about Limelight's financial well-being, business prospects, and operations.  These

material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of Limelight and its financial well-being, business prospects, and operations, thus causing the Company's common stock to be overvalued and artificially inflated at all relevant times.  Defendants' materially false and misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's common stock at artificially inflated prices, thus causing the damages complained of herein.

## LOSS CAUSATION

56.    Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class.

57.    During the Class Period, Plaintiff and the Class purchased common stock of Limelight at artificially inflated prices and were damaged thereby.  The price of Limelight's common stock significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

## SCIENTER ALLEGATIONS

58.    As alleged herein, defendants acted with scienter in that defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, defendants, by virtue of their receipt of information reflecting the true facts regarding Limelight, their control over, and/or receipt and/or modification of Limelight's allegedly materially misleading misstatements and/or

their associations with the Company which made them privy to confidential proprietary information concerning Limelight, participated in the fraudulent scheme alleged herein.

**Applicability of Presumption of Reliance:**
**Fraud On The Market Doctrine**

59.    At all relevant times, the market for Limelight's common stock was an efficient market for the following reasons, among others:

    (a)    Limelight stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

    (b)    As a regulated issuer, Limelight filed periodic public reports with the SEC and the NASDAQ;

    (c)    Limelight regularly communicated with public investors <u>via</u> established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

    (d)    Limelight was followed by several securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

60.    As a result of the foregoing, the market for Limelight's common stock promptly digested current information regarding Limelight from all publicly-available sources and reflected such information in Limelight's stock price. Under these circumstances, all purchasers of Limelight's common stock during the Class Period suffered similar injury through their

purchase of the Company's common stock at artificially inflated prices and a presumption of reliance applies.

## NO SAFE HARBOR

61.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made.  To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, defendants are liable for those false forward-looking statements, because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Limelight who knew that those statements were false when made.

## FIRST CLAIM
### Violation of Section 11 of
### The Securities Act Against All Defendants

62.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein only to the extent, however, that such allegations do not allege fraud, scienter or the intent of the defendants to defraud Plaintiff or members of the Class.  This count is predicated upon defendants' strict liability for making false and materially misleading statements in the Registration Statement.

63.     This claim is asserted by Plaintiff against all defendants by, and on behalf of,

persons who acquired shares of the Company's common stock pursuant to or traceable to the false Registration Statement issued in connection with the June 8, 2007 IPO.

64.     Individual Defendants as signatories of the Registration Statement, as directors and/or officers of Limelight and controlling persons of the issuer, owed to the holders of the stock obtained through the Registration Statement the duty to make a reasonable and diligent investigation of the statements contained in the Registration Statement at the time they became effective to ensure that such statements were true and correct, and that there was no omission of material facts required to be stated in order to make the statements contained therein not misleading.  Defendants knew, or in the exercise of reasonable care should have known, of the material misstatements and omissions contained in or omitted from the Registration Statement as set forth herein.  As such, defendants are liable to the Class.

65.     Underwriter Defendants owed to the holders of the stock obtained through the Registration Statement the duty to make a reasonable and diligent investigation of the statements contained in the Registration Statement at the time they became effective to ensure that such statements were true and correct and that there was no omission of material facts required to be stated in order to make the statements contained therein not misleading.  Defendants knew, or in the exercise of reasonable care should have known, of the material misstatements and omissions contained in or omitted from the Registration Statement as set forth herein.  As such, defendants are liable to the Class.

66.     None of the defendants made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true or that there was no omission of material facts necessary to make the statements made therein not misleading.

67.     Defendants issued and disseminated, caused to be issued and disseminated, and participated in the issuance and dissemination of, material misstatements to the investing public which were contained in the Registration Statement, which misrepresented or failed to disclose, *inter alia*, the facts set forth above.  By reason of the conduct herein alleged, each defendant violated and/or controlled a person who violated Section 11 of the Securities Act.

68.     As a direct and proximate result of defendants' acts and omissions in violation of the Securities Act, the market price of Limelight's common stock sold in the IPO was artificially inflated, and Plaintiff and the Class suffered substantial damage in connection with their ownership of Limelight's common stock pursuant to the Registration Statement.

69.     Limelight is the issuer of the stock sold <u>via</u> the Registration Statement.  As issuer of the stock, the Company is strictly liable to Plaintiff and the Class for the material misstatements and omissions therein.

70.     At the times they obtained their shares of Limelight, Plaintiff and members of the Class did so without knowledge of the facts concerning the misstatements or omissions alleged herein.

71.     This action is brought within one year after discovery of the untrue statements and omissions in and from the Registration Statement which should have been made through the exercise of reasonable diligence, and within three years of the effective date of the Prospectus.

72.     By virtue of the foregoing, Plaintiff and the other members of the Class are entitled to damages under Section 11 as measured by the provisions of Section 11(e), from the defendants and each of them, jointly and severally.

## SECOND CLAIM
### Violation of Section 12(a)(2) of
### The Securities Act Against All Defendants

73.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

74.     This Count is brought pursuant to Section 12(a)(2) of the Securities Act on behalf of the Class, against all defendants.

75.     Defendants were sellers, offerors, and/or solicitors of purchasers of the shares offered pursuant to the Limelight Offering Registration Statement.

76.     The Limelight IPO Registration Statement contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and concealed and failed to disclose material facts.  The Individual Defendants' actions of solicitation included participating in the preparation of the false the misleading Registration Statement.

77.     Defendants owed to the purchasers of Limelight's common stock, including Plaintiff and other members of the Class, the duty to make a reasonable and diligent investigation of the statements contained in the IPO materials, including the Registration Statement, to ensure that such statements were true and that there was no omission to state a material fact required to be stated in order to make the statements contained therein not misleading.  Defendants knew of, or in the exercise of reasonable care should have known of, the misstatements and omissions contained in the IPO materials as set forth above.

78.     Plaintiff and other members of the Class purchased or otherwise acquired Limelight's common stock pursuant to and/or traceable to the defective Registration Statement. Plaintiff did not know, or in the exercise of reasonable diligence could not have known, of the

untruths and omissions contained in the Registration Statement.

79.    Plaintiff, individually and representatively, hereby offer to tender to defendants that common stock which Plaintiff and other Class members continue to own, on behalf of all members of the Class who continue to own such common stock, in return for the consideration paid for that common stock together with interest thereon.  Class members who have sold their Limelight common stock are entitled to rescissory damages.

80.    By reason of the conduct alleged herein, these defendants violated, and/or controlled a person who violated Section 12(a)(2) of the Securities Act.  Accordingly, Plaintiff and members of the Class who hold Limelight common stock purchased in the IPO have the right to rescind and recover the consideration paid for their Limelight common stock, and hereby elect to rescind and tender their Limelight common stock to the defendants sued herein.  Plaintiff and Class members who have sold their Limelight common stock are entitled to rescissory damages.

81.    This action is brought within three years from the time that the common stock upon which this Count is brought was sold to the public, and within one year from the time when Plaintiff discovered or reasonably could have discovered the facts upon which this Count is based.

### THIRD CLAIM
### Violation of Section 15 of The Securities Act
### Against the Individual Defendants

82.    Plaintiff repeats and realleges each and every allegation contained above, excluding all allegations above that contain facts necessary to prove any elements not required to state a Section 15 claim, including without limitation, scienter.

83.    This count is asserted against Individual Defendants and is based upon Section 15

of the Securities Act.

84.     Individual Defendants, by virtue of their offices, directorship and specific acts were, at the time of the wrongs alleged herein and as set forth herein, controlling persons of Limelight within the meaning of Section 15 of the Securities Act. The Individual Defendants had the power and influence and exercised the same to cause Limelight to engage in the acts described herein.

85.     Individual Defendants' position made them privy to and provided them with actual knowledge of the material facts concealed from Plaintiff and the Class.

86.     By virtue of the conduct alleged herein, the Individual Defendants are liable for the aforesaid wrongful conduct and are liable to Plaintiff and the Class for damages suffered.

**FOURTH CLAIM**
**Violation of Section 10(b) of**
**The Exchange Act and Rule 10b-5**
**Promulgated Thereunder Against All Defendants**

87.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

88.     During the Class Period, defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase Limelight's common stock at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

89.     Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which

operated as a fraud and deceit upon the purchasers of the Company's common stock in an effort to maintain artificially high market prices for Limelight's common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

90.     Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Limelight's financial well-being and prospects, as specified herein.

91.     These defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Limelight's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about Limelight and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of Limelight's common stock during the Class Period.

92.     Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of his

responsibilities and activities as a senior officer and/or director of the Company was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

93.    The defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Limelight's financial well-being and prospects from the investing public and supporting the artificially inflated price of its common stock.  As demonstrated by defendants' overstatements and misstatements of the Company's financial well-being, business relationships, and prospects throughout the Class Period, defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

94.    As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Limelight's common stock was artificially inflated during the Class Period.  In ignorance of the fact that market prices of Limelight's common stock were artificially inflated, and relying directly or indirectly on the

false and misleading statements made by defendants, or upon the integrity of the market in which the common stock trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by defendants, but not disclosed in public statements by defendants during the Class Period, Plaintiff and the other members of the Class acquired Limelight's common stock during the Class Period at artificially high prices and were damaged thereby.

95.     At the time of said misrepresentations and omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiff and the other members of the Class and the marketplace known the truth regarding the problems that Limelight was experiencing, which were not disclosed by defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their Limelight's common stock, or, if they had acquired such common stock during the Class Period, they would not have done so at the artificially inflated prices which they paid.

96.     By virtue of the foregoing, defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

97.     As a direct and proximate result of defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's common stock during the Class Period.

### FIFTH CLAIM
### Violation of Section 20(a) of
### The Exchange Act Against the Individual Defendants

98.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

99.     The Individual Defendants acted as controlling persons of Limelight within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level

positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading.  The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

100.    In particular, each of these defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

101.    As set forth above, Limelight and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

(a)    Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b)    Awarding compensatory damages in favor of Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)    Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)    Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.


Dated:  August 23, 2007                     **BRODSKY & SMITH, LLC**

                                            By:*/s/ Evan J. Smith* (ES3254)
                                            Evan J. Smith, Esquire (ES3254)
                                            240 Mineola Boulevard
                                            Mineola, NY 11501
                                            (516) 741-4977
                                            (516) 741-0626 (facsimile)

                                            **SCHIFFRIN BARROWAY
                                            TOPAZ & KESSLER LLP**
                                            Richard A. Maniskas, Esquire
                                            D. Seamus Kaskela, Esquire
                                            280 King of Prussia Road
                                            Radnor, PA 19087
                                            (610) 667-7706
                                            (610) 667-7056 (facsimile)

                                            *Attorneys for Plaintiffs*